```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


MICHAEL JAMES THIVIERGE,       )
                               )
          Plaintiff,           )    CIVIL ACTION NO.
                               )    12-30144-DPW
                               )
     v.                        )
                               )
MICHAEL J. ASTRUE,             )
Commissioner of Social         )
Security Administration,       )
                               )
          Defendant.           )
```

MEMORANDUM AND ORDER
June 10, 2013

Michael James Thivierge seeks judicial review of the denial of his application for Supplemental Security Income, 42 U.S.C. § 1381 *et seq.*, as provided by 42 U.S.C. § 405(g).

### I. BACKGROUND

Thivierge originally applied for benefits in November 2009 based on a variety of disabilities, and claimed that he was disabled as of January 1, 1992. The Social Security Administration denied the application first in May 2010 and again upon reconsideration in January 2011. Thivierge requested a hearing before an ALJ in March 2011, and a hearing was scheduled for January 18, 2012. In the interim, Thivierge obtained non-attorney representation. At the January 18 hearing, ALJ Penny Loucas allowed Thivierge extra time to develop the record, and

held an additional hearing on April 4, 2012.  At that hearing, Thivierge amended his alleged disability onset date to June 24, 2010, the day after he fell twenty-five feet from a ladder while working as a roofer.  AR 208.

On April 10, 2012, the ALJ determined Thivierge was not disabled.  The ALJ followed the five steps for evaluating disability prescribed by 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.960(c)(1).  First, she found that Thivierge had not engaged in substantial gainful activity since his disability onset date.  AR 67-68.  Second, she concluded that several of Thivierge's physical impairments from the fall (fractures to several transverse processes of his vertebrae, his left posterial lateral 11th rib and left scapula, disc herniation, and bilateral shoulder tendonitis) were severe.  AR 68.  However, she concluded that other physical impairments (chronic obstructive pulmonary disorder, renal cysts/nephrolithiasis, and gout) and mental impairments (depression, anxiety disorder, and a history of substance abuse) were not severe, either singly or in combination.  AR 70-73.  Third, she determined that Thivierge had the Residual Functional Capacity for medium work, subject to certain limitations:  (1) no climbing; (2) only occasional bilateral overhead lifting and never more than 20 pounds; (3) only balancing, bending, kneeling, crouching, and crawling; and (4) no concentrated exposure to hazards such as dangerous

machinery.  AR 74-78.  Fourth, she found that Thivierge could not perform his past relevant work as a construction laborer.  AR 78.  And fifth, relying on a vocational expert's testimony, she determined that Thivierge could perform jobs existing in significant numbers in the national economy, such as laundry worker, grocery bagger, and food service worker.  AR 78-79.  As a result, the ALJ concluded that Thivierge failed to establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

On June 25, 2012, the Social Security Appeals Council denied administrative review and adopted the ALJ's decision as the final decision of the Commissioner.  Thivierge filed for judicial review in this court on August 10, 2012.  He has moved for judgment on the pleadings, seeking to overturn the Commissioner's denial of his application and requesting remand to a new ALJ.  The government, for its part, has moved to affirm the decision of the Commissioner.

My task is to insure that the ALJ applied the proper legal standards--a point as to which there is no real dispute--and to determine whether the factual findings grounding the denial of Thivierge's application are supported by substantial evidence in

the record.  42 U.S.C. § 405(g); *Manso-Pizarro* v. *Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).  I must uphold the ALJ's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion," *Rodriguez* v. *Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).  The ALJ is primarily responsible for weighing the evidence and making credibility determinations.  *Id.*

Thivierge does not now challenge the ALJ's findings as to his physical impairments.  Those finding were, in any event, supported by substantial evidence.  Rather, he argues the ALJ erred in finding that he lacked severe mental impairments--namely, depression and anxiety--and that the ALJ exhibited bias by unduly dwelling on his history of substance abuse.

## II. MEDICAL HISTORY

At the time of the ALJ's determination, Thivierge was 56 years old.  He was separated from his wife, and lived with this 80 year-old mother and developmentally disabled brother.  AR 439.  He had a history of alcohol and drug abuse.  AR440.  In 2009, Thivierge had attempted to commit suicide by drug overdose.  AR 439.  At that time, he was hospitalized for one week, his first and only psychiatric hospitalization.  AR 440.

On May 6, 2010, psychologist Leon Hutt interviewed Thivierge.  Thivierge reported that he had in the past abused

alcohol, opiates, and benzodiazepines.  He told Dr. Hutt about his suicide attempt and said he had been seeing a psychiatrist for about three years.  AR 439-40.  Thivierge had last worked in 2006 installing doors and windows.  AR 439.  He reported being depressed because his health issues prevented him from working as a roofer and he "[didn't] know what to do anymore."  AR 440.  He spent some time taking care of his mother, but also described going for walks and bike rides, and said he had friends and saw people on a regular basis.  AR 440.  Dr. Hutt observed that Thivierge's speech was generally "relevant and coherent." AR 440.  He had fair attentional capacity, "appropriate" affect, normal mood, no indication of an impaired memory, no oddities of thinking or speech, and no indications of psychosis.  AR 440-41. Accordingly, Dr. Hutt diagnosed Thivierge as suffering from adjustment disorder with depressed mood.  AR 441.  Dr. Hutt assigned Thivierge a Global Assessment of Functioning ("GAF") score of 75, AR 441, indicating that his symptoms were "transient and expectable reactions to psychological stressors" with "no more than slight impairment in social, occupational, or school functioning."  *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-IV-TR, at 34 (4th ed. 2000).  Dr. Hutt concluded that Thivierge could understand, follow, and remember work-related instructions, and "psychologically tolerate stressors associated with employment."  AR 441.

On May 11, 2010, state agency psychologist Ruth Aisenberg concluded that, based on his medical records, Thivierge was not severely impaired. AR 443.

After his accident on July 23, 2010, Thivierge was treated with Percocet. However, he was advised by a treating physician shortly after the accident to taper off due to a history of opiate dependence. AR 711. When Thivierge went to the hospital for gout-related knee pain in July 2010, he reported that he had been buying Percocet off the street to treat his pain and had used coacaine and heroin two days earlier. AR 559-60. Thivierge began treatment at a methadone clinic that summer. AR 727.

On January 1, 2011, state agency consultant Liese Franklin-Zitskat also conducted a psychological examination of Thivierge. Thivierge told Dr. Franklin-Zitskat that he had been "intermittently depressed" for the last few years, citing his marital separation, his difficulty finding a job, and his mother's and his brother's mental problems. AR725-26. Nevertheless, Thivierge said he was "currently looking for work" and "believe[d] that he could possibly perform a desk job." AR 726. He said he dealt with stress by "staying on his medications" and trying to "walk away" from stressful situations. AR 726. Thivierge also reported he could carry out and remember written instructions and complete tasks in a timely fashion; he reported no difficulty with traveling, personal care, or

activities of daily living.  AR 726.  He denied any suicidal ideation.  AR 728.

Dr. Franklin-Zitskat described Thivierge as polite, cooperative, alert and well-oriented, with "normal" speech, "appropriate" affect, and "good" insight and judgment.  AR 728.  Thivierge was "stable," Franklin-Zitskat said, but she noted that on other days he had been "irritable and depressed."  AR 728.  She also noted that his concentration seemed "mildly impaired"; his thought process was "generally goal directed," but "became tangential at times."  AR 728.  Dr. Franklin-Zitskat diagnosed Thivierge as suffering from an adjustment disorder with mixed anxiety and depressed mood, and alcohol and opioid dependence in early full remission.  Ar 728.  Like Dr. Hutt, Dr. Franklin-Zitskat assessed a GAF score of 75.  She found that Thivierge was "generally functioning well psychologically, with some mild depressive and anxiety symptoms related to life stressors."  His mental health prognosis was "good, provided he remains clean and sober," she concluded.  AR 728.

On September 26, 2011, Thivierge began treatment with Valerie Sharpe, a psychiatrist.  Thivierge reported that he had been "under a lot of stress" due to family problems and unemployment.  He also said that, because his prior psychiatrist had retired recently, he had been unable to renew his alprazolam prescription.  Thivierge admitted to "buying Xanax, Valium and

Klonopin off the streets out of desperation." AR 813. Although he "constantly worrie[d]" about his mother and felt depressed and anxious at home, Thivierge was "able to enjoy himself" when he got out of the house and painted houses with a friend. AR 813. He denied problems with panic attacks. He also participated in anger management therapy, as a result of which he felt "able to cope with his anger better." AR 813. Dr. Sharpe described Thivierge as "cooperative" and "agitated at times but . . . generally calm," with an "appropriate" affect. AR 813. She noted that his thought process was "often circumstantial and tangential," but that he was "alert and oriented in all spheres," and "not delusional or paranoid." AR 814. She noted several times that he was "mainly focused" on starting back on benzodiazepines. AR 814. Dr. Sharpe expressed concern about the possibility of further drug abuse, but temporarily prescribed Klonopin, in part because Thivierge "seem[ed] to be motivated to see a psychiatrist and use only prescribed medications." AR 814. Dr. Sharpe assigned Thivierge a GAF score of 55, AR 815, which is characterized as showing "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." DSM-IV-TR, at 34.

On October 3, 2011, Thivierge reported to Dr. Sharpe that the Klonopin was helping to "take the edge off," and that he had not bought any more drugs off the street. AR 939. Thivierge had

also received a $25,000 worker's compensation settlement.  AR206-208.  He used the money to pay off debts and buy a motorcycle, which put him in a better mood.  AR 939.  Dr. Sharpe agreed that Thivierge's mood had improved since their last meeting.  She noted that his affect was "appropriate," and that his cognition, insight, judgment and impulse control were "intact."  AR 940.

In an October 31, 2011 encounter with Dr. Sharpe, Thivierge reported he was feeling "lousy" and appeared "moody," which Thivierge  attributed in part to a decrease in his methadone dosage.  AR 936.  Still, he denied significant anxiety or depression, and he reported eating and sleeping well.  AR 936.  Dr. Sharpe did not note any aberrations in his mental status.  AR 936.  Despite Thivierge's complaints about his benzodiazepine dosage, Dr. Sharpe refused to modify his regimen and continued the prior Klonopin prescription.  AR 937.

On November 28, 2011, Thivierge reported to Dr. Sharpe that things were "going fairly well."  AR 933. His family still caused stress, but he was "coping with them as well as he [could]."  AR 933.

On January 23, 2012, Thivierge told Dr. Sharpe that he had been "very anxious and depressed" due to "various stressors," including his family and his difficulty obtaining disability benefits.  AR 929.  He stated that he sometimes felt "like he [was] about to 'boil over'" and had thought about crashing his

motorcycle, but "would not actually harm himself."  AR 929.  Dr. Sharpe noted that Thivierge was "mainly focused on his issues with Klonopin," which he said made him irritable, while Xanax and Valium had not.  AR 929-30.  Although Thivierge's mood was depressed and anxious, his cognition and impulse control remained "intact," and his insight and judgment were "fair."  AR 930.  Dr. Sharpe discontinued Klonopin, refused to prescribe Xanax in part due to addictive potential, and instead prescribed Valium as well as citalopram, an antidepressant.  AR 930.

On February 13, 2012, Thivierge reported feeling "more mellow" since the change in his medication. He still felt stress, but was "no longer feeling angry."  AR 925.  He also stated that he "no longer crave[d]" prescription or illicit drugs, and that the prospect of riding his motorcycle was a "big incentive" for getting off methadone. AR 925.  Dr. Sharpe observed that Thivierge's mood was "better" with an "appropriate" affect that was "noticeably brighter" than at their last appointment.  AR 926.  She described "significant improvement in symptoms of anxiety, anger and depression" as a result of the medication change, "in spite of continued stressors."  AR 926.

### III. ANALYSIS

Social Security Administration regulations prescribe evaluation of mental impairments based on the degree of limitation in four functional areas: (1) activities of daily

-10-

living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  20 C.F.R. § 416.920a(c)(3).  The regulations inform applicants that, based on a finding of "mild" ratings in the first three areas and no episodes of decompensation, "we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."  20 C.F.R. § 416.920a(d)(1).  Based on the medical history described above, the ALJ found that Thivierge had "mild" limitations in the first three areas, and no episodes of decompensation during the claimed disability period.  Thus, consistent with the regulations, she found that Thivierge did not suffer from a "severe" mental impairment.

There is substantial evidence in the record to support the ALJ's determination.  The diagnoses of Dr. Hutt and Dr. Franklin Zitskat place Thivierge's mental impairments squarely in the "mild" category.  I recognize that Dr. Hutt's diagnosis may be entitled to less weight because it pre-dated the July 23, 2010 accident.  Dr. Franklin-Zitskat, however, was able to evaluate Thivierge after the accident and rendered a diagnosis largely consistent with that provided by Dr. Hutt.  Their reports show little limitation on Thivierge's activities of daily living and, while meeting with Dr. Franklin-Zitskat, Thivierge actually

denied any difficulty in this area.  With regard to social functioning, Thivierge reported to both doctors that he felt stress at home, but that he fared better outside of that setting, had friends, and generally got along with co-workers.  As to concentration, persistence and pace, the doctors found Thivierge coherent and generally attentive.  Thivierge himself again reported to Franklin-Zitskat that he was looking for work and considered himself able to perform a desk job.  The ALJ also highlighted an instance in which Thivierge's car malfunctioned, so he got a ride from his uncle to an appointment with Franklin-Zitskat; the ALJ reasonably found that this "demonstrated abilities to problem-solve and pursue solutions."  AR 73; AR 725.  Finally, as to episodes of decompensation, the only instance in the record is Thivierge's 2009 suicide attempt and week-long hospitalization, both of which pre-dated the amended June 24, 2010 disability onset date.

   The ALJ also considered and explained her reasons for not giving controlling weight to the opinions of Dr. Sharpe regarding the severity of Thivierge's mental impairments.  For example, the ALJ noted that Dr. Sharpe had only been treating Thivierge for a matter of months.  And, even within that timeframe, Dr. Sharpe's assessment of Thivierge significantly improved after changing his medication.  From these facts, the ALJ reasonably concluded that the course of treatment with Dr. Sharpe did not establish that

Thivierge had a severe mental impairment that "lasted or [could] be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[1]

Moreover, even prior to the change in medication, Dr. Sharpe's reports indicate few signs of impairment in daily living. They also reflect what can fairly be characterized as mild to moderate concentration problems, because reports of Thivierge's thoughts being "circumstantial and tangential" must be balanced against the report that he was "alert and oriented." Moreover, even though Dr. Sharpe's assigned GAF level reflects an overall "moderate" impairment in social functioning, her reports are in other respects largely consistent with a finding of mild social difficulty. For example, Thivierge reported the ability to enjoy himself when he got out of the house and saw friends. And, entirely consistent with the prior diagnoses, Thivierge had no episodes of decompensation while being treated with Dr. Sharpe.

Thus, to the extent Dr. Sharpe's diagnostic reports differ from those of Dr. Hutt and Dr. Franklin-Zitskat, they do so only to a slight degree. The ALJ weighed Dr. Sharpe's reports against the more optimistic earlier evaluations, while giving important

---

[1] Thivierge's three years of prior psychiatric treatment were properly disregarded by the ALJ because Thivierge never provided documentation of such treatment that could meaningfully add to an assessment of the duration and thus severity of any mental impairment. AR 71 n.2.

weight to the marked improvements to Thivierge's mental health within a short period of adjustment to his medication, and without self-medication.  Although others might disagree about the proper ratings of Thivierge's functional limitations by virtue of mental impairment, the ratings ascribed by the ALJ were supported by substantial evidence and reflected a reasonable view of only slightly divergent evidence.[2]

Finally, Thivierge has failed to demonstrate any bias by the ALJ with respect to his history of drug abuse.  The ALJ appropriately weighed Thivierge's history of drug abuse and behavior during treatment--including frequent reports that he was

---

[2] I also note that, even ascribing more "moderate" functional limitations to Thivierge, and even taking into account his 2009 suicide attempt and hospitalization, he likely would not have qualified for the relevant affective disorders or anxiety disorders included in the regulatory listing of severe impairments.  *See* 20 C.F.R. Part 404, Subpart P, app. 1, §§ 12.04, 12.06.  Although the criteria are varied, Thivierge realistically could not qualify without some *marked* restrictions in daily living, *marked* difficulties in social functioning or concentration, or *repeated* episodes of decompensation--all findings unsupported by this record.  As a result, the ALJ would have remained responsible for determining Thivierge's residual functional capacity.  20 C.F.R. § 416.920a(d)(3).  Because ALJ Loucas had effectively concluded that Thivierge's mental health placed little limitation on his functional capacity, it is unlikely that the technical difference in labeling those limitations as "moderate" rather than "mild" would have changed her assessment of his residual functional capacity or ultimate disability determination. *Cf., e.g., Mills* v. *Apfel*, No. 99-27-P-H, 1999 WL 33117114, at *1 (D. Me. Nov. 24, 1999), *report and recommendation adopted as modified*, 84 F. Supp. 2d 146 (D. Me. 2000), *aff'd*, 244 F.3d 1 (1st Cir. 2001) (mental impairments imposing moderate limitations on daily life activities, social functioning, and concentration did not preclude work as laundry worker).

focused on obtaining benzodiazepines--to evaluate his motivation during treatment and to discredit certain subjective reports of pain.  AR 76.  Moreover, far from using his history of drug abuse simply to ignore his mental impairments, the ALJ considered Thivierge's history of drug abuse in an effort to bring into sharper focus the significance of a proper drug treatment regimen for his mental health.  AR 77.  This was not bias but rather a legitimate medical consideration, echoed by both Dr. Franklin-Zitskat, AR 728, and Dr. Sharpe, AR 925-26, 930.

### IV. CONCLUSION

For the reasons set forth more fully above, the decision of the Commissioner is AFFIRMED.


**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE